## Case No. 16,056.

### UNITED STATES v. PLUMER et al.

[3 Cliff. 28.] [1]

Circuit Court, D. Massachusetts. July 6, 1859.

CIRCUIT COURTS—CRIMINAL JURISDICTION IN ERROR — WRITS OF ERROR — CRIMES COMMITTED ON SHIPBOARD—INDICTMENT — CHALLENGES OF JURORS—LIST OF WITNESSES—SENTENCE.

1. A writ of error coram vobis does not lie in the circuit court in a criminal case, either from its own judgment or the judgment of the district court.

2. Being without any common-law authority to try or punish offenders, except for contempt, they cannot exercise any power in a criminal case not derived expressly or impliedly from an act of congress.

3. No authority has been given in the acts of congress to the circuit court to re-examine, by writ of error or in any other manner, the rulings or judgments of the district court in criminal cases. No such authority is given by the fourteenth section of the judiciary act.

4. By that section congress only intended to vest the power to issue such other writs in cases where jurisdiction already existed, and not where the jurisdiction was to be acquired by means of the writ to be issued.

[Cited in Grantland v. City of Memphis, 12 Fed. 288.]

5. Difference between the writ of error coram nobis and the writ of error coram vobis explained and illustrated.

6. If the alleged error be in the judgment itself, and not in the process, a writ of error does not lie in the same court to correct it.

7. The indictment averred that the alleged crime was committed in and on board of a certain ship called the Junior, then and there owned by and belonging to the four persons therein named, all of whom are alleged to be citizens of the United States, and also contained the further allegation that all the criminal acts

of the prisoner were committed within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of the court, and out of the jurisdiction of any particular state of the United States. Held, that there is a sufficient averment that the circuit court had jurisdiction, and that the injured party was within and under the protection of the United States, and in the peace thereof.

8. In this record it sufficiently appears that the prisoner was permitted his right of challenge.

9. By this record it sufficiently appears that the prisoner was present at the impanelling of jury, and when the verdict was rendered by the jury.

10. All the counts in this indictment held good; but granting that some are bad and some good, the verdict should stand.

11. The use of the past tense in this record is no valid objection to the record.

12. It sufficiently appears in and by the record that issue was joined.

13. When the docket entries show that the list of witnesses was furnished the prisoner in a capital case, and the record shows that prisoner acknowledged in open court, before the jury was impanelled, that he did receive it two entire days prior to that time, it sufficiently appears that such list was furnished as required.

14. It sufficiently appears in and by this record of what felony the prisoner was convicted and for what he was sentenced.

15. The designation "foreman," appended to the name of the person signing the indictment as such, is sufficient, as the designation "foreman" refers to the introductory clause of the indictment, and to the record, as verifying the legal inference that "foreman" means foreman of the grand jury.

The prisoner, with three others, was indicted in the circuit court for the district of Massachusetts, for murder on the high seas. Plumer was tried and convicted. Motions for a new trial and in arrest were filed, but they were afterwards waived, and Plumer was sentenced to be executed. A motion was now made for allowance of a writ of error coram nobis.

Benjamin F. Butler, George W. Searle, and F. F. Heard for plaintiff in error.

C. L. Woodbury, Dist. Atty., and M. Andros, Asst. Dist. Atty., appeared for the Government.

The indictment, record, and docket entries were thus:

#### The Indictment.

#### United States of America.

Circuit Court of the United States of America, for the District of Massachusetts.

At a circuit court of the United States of America, for the district of Massachusetts, begun and holden at Boston, within and for said district, on the 15th of October, 1858.

The jurors of the United States of America, within and for the district aforesaid, upon their oath, present:

That Cyrus Plumer, mariner, otherwise called Cyrus W. Plumer, late of New Bedford, in said district, William H. Carther, mariner, otherwise called Richard Carther,

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

late of New Bedford, in said district, William Herbert, late of New Bedford, in said district, mariner, and Charles H. Stanley, mariner, otherwise called John W. Ballard, late of New Bedford, in said district, on the 26th of December, 1857, with force and arms on the high seas and within the admiralty and maritime jurisdiction of thé said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and on board of a certain vessel, the same then and there being a ship called Junior, then and there owned by and belonging to David R. Greene, Robert B. Greene, Dennis Wood, and Willard Nye, all citizens of the said United States, in and upon one Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, did make an assault, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, with a certain gun, called a whaling gun, then and there charged with gunpowder and three leaden bullets, which said gun he the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in both his hands then and there had, and held at and against the body of him the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, then and there feloniously, wilfully, and of his malice aforethought, did shoot off and discharge, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there with the three leaden bullets aforesaid, out of the gun aforesaid, then and there by force of the gunpowder aforesaid, by him the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there shot off, discharged, and sent forth as aforesaid, him the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the left side of the body of him the said Archibald Mellen, then and there feloniously, wilfully, and of his malice aforethought, did strike, penetrate, and wound, then and there giving to him the said Archibald Mellen, then and there with the three leaden bullets aforesaid, so as aforesaid by him the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there shot off, discharged, and sent forth out of the gun aforesaid, by force of

the gunpowder aforesaid, in, upon, and against the left side of the body of him the said Archibald Mellen, and then and there penetrating into and through the body of him the said Archibald Mellen, one mortal wound, of which said mortal wound, the said Archibald Mellen, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of· any particular state of the said United States, then and there on the said twenty-sixth day of December, in the year aforesaid, instantly died. And that the said William H. Carther, otherwise called Richard Carther, William Herbert, and Chares H. Stanley, otherwise called John W. Ballard, then and there on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, were present, and then and there feloniously, wilfully, and of their malice aforethought, were aiding, abetting, comforting, assisting, and maintaining the said Cyrus Plumer, otherwise called Cyrus W. Plumer, the felony and murder aforesaid, in the manner and form aforesaid, then and there to do, commit, and perpetrate.

And so the jurors aforesaid, upon their oath aforesaid, do say that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, feloniously, wilfully, and of their malice aforethought, him the said Archibald Mellen, did then and there, in the manner and form aforesaid, kill and murder. Against the peace and dignity of the said United States, and contrary to the form of the statute in such case made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present that Cyrus Plumer, mariner, otherwise called Cyrus W. Plumer, late of New Bedford, in said district, William H. Carther, mariner, otherwise called Richard Carther, late of New Bedford, in said district, William Herbert, late of New Bedford, in said district, mariner, and Charles H. Stanley, mariner, otherwise called John W. Ballard, late of New Bedford, in said district, on the twenty-sixth day of December, in the year of our Lord one thousand eight hundred and fifty-seven, with force and arms, on the high seas, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and on board of a certain vessel, the same then and there being a ship called ·Junior,

then and there owned by and belonging to David R. Greene, Robert B. Greene, Dennis Wood, and Willard Nye, all citizens of the said United States, in and upon one Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, did make an assault, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there, with a certain instrument of wood and iron, called a "hatchet," which he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there, in his right hand, had and held, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the back of the neck of him the said Archibald Mellen, then and there feloniously wilfully, and of his malice aforethought did strike, thrust, and penetrate, then and there giving to the said Archibald Mellen, in and upon the back of the neck of him the said Archibald Mellen, then and there with the hatchet aforesaid, by such striking with the hatchet aforesaid, in the manner aforesaid, one mortal wound, of the length of three inches, and of the depth of two-inches, of which said mortal wound the said Archibald Mellen, on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, instantly died. And that the said William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, then and there, on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought were present, and then and there feloniously, wilfully, and of their malice aforethought were aiding, abetting, comforting, assisting, and maintaining the said Cyrus Plumer, otherwise called Cyrus W. Plumer, the felony and murder aforesaid, in the manner and form aforesaid, to do, commit, and perpetrate.

And so the jurors aforesaid, upon their oath aforesaid, do say that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, feloniously, wilfully, and of their malice aforethought, him the said Archibald Mellen, then and there, in the manner and form aforesaid, did kill and murder. Against the peace and dignity of the said United States, and contrary to the form of the statute in such case made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present that Cyrus Plumer, mariner, otherwise called Cyrus W. Plumer, late of New Bedford, in said district, William H. Carther, mariner, otherwise called Richard Carther, late of New Bedford, in said district, William Herbert, late of New Bedford, in said district, mariner, and Charles H. Stanley, mariner, otherwise called John W. Ballard, late of New Bedford, in said district, on the twenty-sixth day of December, in the year of our Lord one thousand eight hundred and fifty-seven, with force and arms, on the high seas, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and on board of a certain vessel, the same then and there being a ship called Junior, then and there owned by and belonging to David R. Greene, Robert B. Greene, Dennis Wood, and Willard Nye, all citizens of the said United States, in and upon one Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought did make an assault, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there, with a certain instrument of wood and iron, called a hatchet, which he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there in his right hand had and held, the said Archibald Mellen then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the neck, back, and shoulders of him, the said Archibald Mellen, then and there, feloniously, wilfully, and of his malice aforethought did strike, thrust, and penetrate, then and there giving to the said Archibald Mellen, in and upon the neck, back, and shoulders of him, the said Archibald Mellen, then and there with the hatchet aforesaid, by such striking with the hatchet aforesaid, in the manner aforesaid, several mortal wounds,

to wit, one mortal wound in and upon the back of the neck of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches, and one mortal wound in and upon the back of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches, and two mortal wounds in and upon the left shoulder of him, the said Archibald Mellen, each of said two last-mentioned mortal wounds being of the length of three inches, and of the depth of two inches, of which said several mentioned and described mortal wounds, the said Archibald Mellen, on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, instantly died. And that the said William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, then and there, on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought were present, and then and there feloniously, wilfully, and of their malice aforethought were aiding, abetting, comforting, assisting, and maintaining the said Cyrus Plumer, otherwise called Cyrus W. Plumer, the felony and murder aforesaid, in the manner and form aforesaid, to do, commit, and perpetrate.

And so the jurors aforesaid, upon their oath aforesaid, do say that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, feloniously, wilfully, and of their malice aforethought, him, the said Archibald Mellen, then and there in the manner and form aforesaid, did kill and murder. Against the peace and dignity of the said United States, and contrary to the form of the statute in such case made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present that Cyrus Plumer, mariner, otherwise called Cyrus W. Plumer, late of New Bedford, in said district, William H. Carther, mariner, otherwise called Richard Carther, late of New Bedford, in said district, William Herbert, late of New Bedford, in said district, mariner, and Charles H. Stanley, mariner, otherwise called John W. Ballard, late of New Bedford, in said district, on the twenty-sixth day of December, in the year of our Lord one thousand eight hundred and fifty-seven,

with force and arms on the high seas, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and on board of a certain vessel, the same then and there being a ship called Junior, then and there owned by and belonging to David R. Greene, Robert B. Greene, Dennis Wood, and Willard Nye, all citizens of the said United States, in and upon one Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, did make an assault, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there a certain gun, called a whaling gun, then and there charged with gunpowder and three leaden bullets, which said gun the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in both his hands, then and there had and held at and against the body of him, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, then and there feloniously, wilfully, and of his malice aforethought did shoot off and discharge, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there with the three leaden bullets aforesaid, out of the gun aforesaid, then and there by force of the gunpowder aforesaid, by him the said Cyrus Plumer, otherwise called Cyrus W. Plumer, so as aforesaid shot off, discharged, and sent forth, him, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the left side of the body of him, the said Archibald Mellen, then and there feloniously, wilfully, and of his malice aforethought did strike, penetrate, and wound; and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, then and there with a certain instrument of wood and iron, called a hatchet, which he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and

there in his right hand had and held, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the neck, breast, shoulders, body, and back of him, the said Archibald Mellen, feloniously, wilfully, and of his malice aforethought did strike, then and there giving to him, the said Archibald Mellen, as well by the three leaden bullets aforesaid, so as aforesaid, by him, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, shot off, discharged, and sent forth out of the gun aforesaid, by force of the gunpowder aforesaid, at and against the body of him, the said Archibald Mellen, in the manner and form aforesaid, as by the instrument of wood and iron called a hatchet, as aforesaid, several mortal wounds, to 'wit, one mortal wound in and upon the left side of the body of him, the said Archibald Mellen, and then and there penetrating into and through the body of him, the said Archibald Mellen; and one mortal wound in and upon the back of the neck of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches; and one mortal wound in and upon the back of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches; and two mortal wounds in and upon the left shoulder of him, the said Archibald Mellen, each of said two last-mentioned mortal wounds being of the length of three inches, and of the depth of two inches, of which said several mentioned and described mortal wounds, he, the said Archibald Mellen, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, on the said twenty-sixth day of December, in the year aforesaid, instantly died. And that the said William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, then and there, on the said twenty-sixth day of December, in the year aforesaid, in and on board the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought were present, and then and there feloniously, wilfully, and of their malice aforethought were aiding, abetting, comforting, assisting, and maintaining the said Cyrus Plumer, otherwise called Cyrus W. Plumer, the felony and murder aforesaid, in the

manner and form aforesaid, to do, commit, and perpetrate. And so the jurors aforesaid, upon their oaths aforesaid, do say that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, feloniously, wilfully, and of their malice aforethought, the said Archibald Mellen, did then and there, in the manner and form aforesaid, kill and murder. Against the peace and dignity of the said United States, and contrary to the form of the statute in such case made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present, that Cyrus Plumer, mariner, otherwise called Cyrus W. Plumer, late of New Bedford, in said district, William H. Carther, mariner, otherwise called Richard Carther, late of New Bedford, in said district, William Herbert, late of New Bedford, in said district, mariner, and Charles H. Stanley, mariner, otherwise called John W. Ballard, late of New Bedford, in said district, on the twenty-sixth day of December, in the year of our Lord one thousand eight hundred and fifty-seven, with force and arms, on the high seas, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of said United States, in and on board of a certain American vessel, the same then and there being a ship called Junior, then and there belonging to a citizen or citizens of the said United States (whose name or names is and are to the jurors aforesaid as yet unknown), in and upon one Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, did make an assault, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there a certain gun called a whaling gun, then and there charged with gunpowder and three leaden bullets, which said gun the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in both his hands, then and there had and held at and against the body of him, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, then and there feloniously, wilfully, and of his malice aforethought, did shoot off and discharge, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there, with the three lead-

en bullets aforesaid, out of the gun aforesaid, then and there, by force of the gunpowder aforesaid, by him, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, so as aforesaid, shot off, discharged, and sent forth, him, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the left side of the body of him, the said Archibald Mellen, then and there feloniously, wilfully, and of his malice aforethought, did strike, penetrate, and wound, and that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, then and there, with a certain instrument of wood and iron, called a hatchet, which he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, then and there in his right hand, had and held, the said Archibald Mellen, then and there being in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, in and upon the neck, breast, shoulders, body, and back of him, the said Archibald Mellen, feloniously, wilfully, and of his malice aforethought, did strike, then and there giving to him, the said Archibald Mellen, as well by the three leaden bullets aforesaid, so as aforesaid, by him, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, shot off, discharged, and sent forth, out of the gun aforesaid, by force of the gunpowder aforesaid, at and against the body of him, the said Archibald Mellen, in the manner and form aforesaid, as by the instrument of wood and iron, called a "hatchet," as aforesaid, several mortal wounds, to wit, one mortal wound in and upon the left side of the body of him, the said Archibald Mellen, and then and there penetrating into and through the body of him, the said Archibald Mellen; and one mortal wound in and upon the back of the neck of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches; and one mortal wound in and upon the back of him, the said Archibald Mellen, of the length of three inches, and of the depth of two inches; and two mortal wounds in and upon the left shoulder of him, the said Archibald Mellen; each of said last-mentioned mortal wounds being of the length of three inches, and of the depth of two inches, of which said several men-

tioned and described mortal wounds, he, the said Archibald Mellen, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, on the said twenty-sixth day of December, in the year aforesaid, instantly died. And that the said William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, then and there, on the said twenty-sixth day of December, in the year aforesaid, in and on board of the ship aforesaid, and on the high seas aforesaid, and within the admiralty and maritime jurisdiction of the said United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States, feloniously, wilfully, and of their malice aforethought, were present, and then and there feloniously, wilfully, and of their malice aforethought were aiding, abetting, comforting, assisting, and maintaining the said Cyrus Plumer, otherwise called Cyrus W. Plumer, the felony and murder aforesaid, in the manner and form aforesaid, to do, commit, and perpetrate. And so the jurors aforesaid, upon their oath aforesaid, do say that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, feloniously, wilfully, and of their malice aforethought, the said Archibald Mellen, did, then and there, in the manner and form aforesaid, kill and murder. Against the peace and dignity of the said United States, and contrary to the form of the statute in such case made and provided.

And the jurors aforesaid, upon their oath aforesaid, do further present that the district of Massachusetts is the district into which the said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, Charles H. Stanley, otherwise called John W. Ballard, were first brought after committing the aforesaid offence.

A true bill.          B. F. Copeland, Foreman.

Charles Levi Woodbury,
United States Attorney for the District of Massachusetts.

### The Record.

At this present October term of this court, A. D. eighteen hundred and fifty-eight, said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, were severally set to the bar and had this indictment read to them; and thereupon they severally said that thereof they were not guilty; and thereof for trial

put themselves upon God and their country; and Benjamin F. Butler and Charles P. Chandler were assigned by the court as counsel for said Plumer; F. F. Heard and F. W. Pelton were assigned as counsel for said Carther; Thornton K. Lothrop and J. Q. Adams were assigned as counsel for said Herbert; and J. Hardy Prince and Samuel M. Quincy were assigned as counsel for Charles H. Stanley, otherwise called John W. Ballard; and said Cyrus Plumer, otherwise called Cyrus W. Plumer, William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, severally acknowledged that they had severally received a copy of the indictment, and a list of the jurors, agreeably to law, and more than two days before the day of their trial.

A jury was thereupon impanelled and sworn to try the issue, namely, John B. Chisholm, foreman, and fellows, namely, Willard Bacon, Daniel C. Bates, Lemuel Grant, Charles Humphrey, Asher Joslin, Charles B. W. Lane, Benjamin Norris, Hiel J. Nelson, William Parker, William Tinker, and Amasa Whitney, of said district.

And the said jury afterwards returned their verdict that said Cyrus Plumer, otherwise called Cyrus W. Plumer, is guilty of murder as alleged in said indictment; William H. Carther, otherwise called Richard Carther, William Herbert, and Charles H. Stanley, otherwise called John W. Ballard, are severally guilty of manslaughter. And thereupon said Cyrus Plumer, otherwise called Cyrus W. Plumer, by his counsel, moves the court for a new trial as follows:

(Here follow motions for new trial, and in arrest.)

Time was allowed by the court for preparation of counsel therein, and the said motions were set down for hearing; and afterwards, at the same term, the counsel of said Plumer moves the court for leave to withdraw the said motions for new trial and in arrest of judgment; and said Cyrus Plumer, otherwise called Cyrus W. Plumer, having been brought into court, and being inquired of personally, asks that such leave may be granted and that the said motions be withdrawn. Wherefore the court doth grant him leave to withdraw the said motions, and the same are accordingly waived and withdrawn by said Plumer; said Plumer is then asked if he had anything to say why judgment of death should not now be pronounced against him; and having replied thereto fully, and no good cause appearing to the contrary, and all matters in the case having been fully heard and understood by the court, it is considered by the court that the said Cyrus Plumer, otherwise called Cyrus W. Plumer, be deemed guilty of felony, and that he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, be taken back to the place from whence he came, and there remain in close confinement until Friday, the twenty-fourth day of June next, and on that day, between the hours of eleven o'clock in the forenoon and one o'clock in the afternoon, he, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, be taken thence to the place of execution, and that he be there hanged by the neck until he be dead.

Among other entries of the clerk's docket were the following, namely: "No. 228. Oct. term, 1858. Oct. 30th. Indictment presented by the grand jury, Benjm. F. Copeland, Foreman. Nov. 1st. Copy of ind. given to each of the four prisoners; also list of petit jurors. Nov. 3rd. The court inquiring, all acknowledged that they had rec'd a copy of the indictment and jury list, and did not object to their arraignment. Dec. 2nd. Motion for a new trial filed, and motion in arrest of judgment, by Plumer. March 30th. The counsel for Plumer withdraws and waives his motion for new trial and in arrest of judgment. Plumer being brought into court asks leave to do so, and leave is granted by the court."

### The Petition.

United States of America.

Circuit Court of the United States of America, for the District of Massachusetts.

To the Honorable the Justices of the Circuit Court of the United States of America, Sitting within and for the First Judicial Circuit, in the District of Massachusetts.

Cyrus W. Plumer, now imprisoned in the district aforesaid, under sentence of death, on a judgment, warrant, process, and proceeding of the said circuit court of the United States of America, for the district of Massachusetts, says that there is manifest error in the process, proceedings, premises, and judgment, and feeling aggrieved thereby assigns as errors in said record, process, proceeding, and judgment the errors named and set forth in the paper hereto annexed, marked "Assignment of Errors."

And said Plumer, by reason of the errors aforesaid, and other errors in the proceedings and record aforesaid, prays that the record and judgment be set aside, reversed, stayed, respited, reprieved, annulled, and held for naught, and that he be discharged thereof, and be suffered to go without day.

Cyrus W. Plumer.

Boston, July 2, 1859.

B. F. Butler,
F. F. Heard,
Geo. W. Searle,
  Of Counsel.

United States of America.

District of Massachusetts, to wit:

Boston, 5th day of July, 1859.

Then personally appeared Cyrus Plumer, otherwise called Cyrus W. Plumer, and made solemn oath that all the errors in fact,

named and set forth in the "assignment of errors," hereto annexed, are true, and every statement of fact in said assignment is true in substance and effect.

Before me,                    G. D. Guild,
United States Commissioner.

## Assignment of Errors.

### United States of America.

Circuit Court of the United States of America, for the District of Massachusetts.

Cyrus Plumer, otherwise called Cyrus W. Plumer, Plaintiff in Error, v. The United States of America, Defendant in Error.

And now, to wit, on the 2d day of July, A. D. 1859, cometh the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in his proper person, who is now imprisoned in the district of Massachusetts, under sentence of death, on a judgment, warrant, process, and proceeding of the said circuit court of the United States of America, for the district of Massachusetts, and immediately saith that in the record and process aforesaid, and also in the giving of the judgment aforesaid, against him the said Cyrus Plumer, otherwise called Cyrus W. Plumer, there is manifest error in these, to wit:—

1. That in and by said indictment and record, there is no sufficient averment that the circuit court in which said indictment was returned and heard, had jurisdiction of the offence therein supposed to be charged.

2. That in and by said indictment and record, there is no sufficient averment that the person therein supposed to be injured was within or under the protection of or jurisdiction of the United States, or in the peace thereof.

3. That in and by said record it nowhere appears, or is set forth, that said Cyrus Plumer, otherwise called Cyrus W. Plumer, was informed of, or permitted to exercise, or did exercise his constitutional right of challenge of the jurors returned for his trial.

4. That in and by said record it nowhere appears, or is set forth, that said Plumer was present, either at the impanelling of the jury that tried him or at the time said trial was had, or said verdict was rendered against him.

5. That in and by said record it nowhere appears that said Plumer was permitted to be heard by said jury so impanelled, either by himself or his counsel; and that in truth and in fact said Plumer was not permitted to address the jury in his own proper person.

6. That said verdict of guilty was rendered upon all the counts of said indictment, while one and more of said counts are defective and insufficient in law to support any judgment.

7. Because all the acts of the court are stated in the past tense.

8. Because it does not appear on said record that issue was joined between the prisoner and the United States.

9. It does not appear on the record, that the prisoner received a list of the proper jurors as by law required.

10. That it nowhere appears in and by said record of what (if any) felony said Plumer was adjudged guilty.

11. That it nowhere appears by said record of what "felony" the court "deemed" or adjudged the said Plumer "to be guilty."

12. That it nowhere appears by said record for what "felony" said Plumer was sentenced to suffer death.

13. That it nowhere appears in and by said record that Plumer received sentence of death for the particular murder of which the jury had found him guilty; but only for "felony" indefinitely, the particular felony not being described in any manner designated.

14. That the verdict is repugnant to the general averment and clause in the indictment giving the court jurisdiction.

15. That said indictment does not appear to be signed by the foreman of the grand jury.

16. That it does not appear that the verdict of said jury was rendered in open court, and in the presence of the defendant.

17. That said record is in other respects informal, insufficient, erroneous, and the judgment thereon void and of none effect.

18. That by the said record it appears that judgment upon the indictment aforesaid was given against him, the said Cyrus Plumer, otherwise called Cyrus W. Plumer, in form aforesaid, whereas judgment by the said circuit court of the United States ought to have been given for the said Plumer, that he be thereof acquitted and go thereupon without day. Therefore in that there is manifest error.

And the said Cyrus Plumer, otherwise called Cyrus W. Plumer, prays that the said judgment aforesaid, for the errors being in the record and process aforesaid, may be reversed and annulled, and absolutely be had for nothing, and that he may be restored to the common law of the land, and to all things which he hath lost on the present occasion.

B. F. Butler, Geo. W. Searle, and F. F. Heard, for petitioner.

Charles Levi Woodbury, Dist. Atty., and Milton Andros, Asst. Atty., for the United States.

Mr. Searle, for the prisoner, contended that the petition and accompanying papers bring into controversy the validity and sufficiency of this record as a chronicle of legal justice, so formal and accurate as to justify the enforcement of its last, its highest, and its most awful penalty. In the unequal contest of the citizen with the government, it is his right, to the last breath in his body, to hold the line and the plummet to authority, and standing there, to insist that law shall be administered with all the forms and all

the circumstances of legal justice. Between that power and the prisoner stand the rights of an accused man. He is now held by the strong arm of might; that arm must be upheld by the law, or its grasp is a nullity; that arm becomes the arbitrary oppressor of the prisoner, and not the representative instrument of justice, unless thus strengthened. The law assumes now to enforce its terrible penalty; it assumes to take human life,—what man cannot give.

The criminal law always, in its worst days, had its theoretical and even its real offsets of benefits and privileges, which were secured to the victim as an inheritance. These have always made up the forms of the criminal system. It is only by due process of law that a man is to be punished. All of this cause has now passed into the record; justice must stand on that record: and its grasp is powerless unless the forms of justice sustain it. Arbitrary power is no attribute of that criminal arm.

We have thought it proper to bring this record to the attention of the court. Now, as the gibbet looks down on a powerless man, we ask the representative ministers of human justice to pause, and with us review this criminal record, to see to it from beginning to end that it shows the forms of justice in all its parts, to the end that, if it be found valid, the law shall have its course and be glorified,—if it can be glorified by human blood; but, if it be found not so, to the end also that the great axe be arrested, and stayed at least until it can rise and fall with law to sustain it. I am desired merely and strictly to open the errors, others are to enforce them. They need no statement in detail.

What must the criminal record show, and does this record come up to the standard? That is in substance the whole question here at issue.

I. What now is this record of which we speak so much? The record may, perhaps with sufficient accuracy, be denominated the contemporaneous history of a judicial proceeding from beginning to end. That record imports absolute truth, and for it there can be no intendment and no presumption. This record has gone into parchment. For to-day and all time that is the history of this cause. See Sayles v. Briggs, 4 Metc. [Mass.] 421; Co. Litt. 260a; Com. Dig. "Record," A, F; Fowler v. Byrd [Case No. 4,999a]; 7 Com. Dig. tit. "Record," A.

II. What must and should that record of a capital felony contain? We claim that the only reliable answer to that question is contained in this proposition, namely:—

The record should contain an exact and formal statement in the present tense of every fact necessary to show demonstrably that judicial proceeding right and proper in all its stages,—showing clearly, without equivocation, doubt, or uncertainty, every fact necessary to justify the final act of sentence. It must be as exact as an indictment; if so exact it is sufficient, if not so exact and definite it is insufficient. The circuit court is one of limited and specific jurisdiction. This record must affirmatively show all the allegations necessary for that specific jurisdiction. Dyson v. State, 26 Miss. (4 Cushm.) 362.

III. This record is so faulty, defective, and insufficient as to impose upon the judicial function the imperative duty of setting it aside as a nullity, recalling the sentence, and retrying the prisoner.

1. The record must show the verdict of the jury in all cases of capital felony to have been delivered in open court in the presence of the prisoner. Co. Litt. 227b; 3 Inst. 110; 2 Hawk. P. C. (Ed. 1824) c. 47, § 2; 2 Hale, P. C. 300; Bac. Abr. "Verdict," B; 2 Gabb. Cr. Law (Dublin Ed. 1843) 529; Archb. Cr. Pl. (London Ed. 1856) 146.

2. The fourth and sixth assignments are valid. The entry of the proceedings in the past tense is fatal, on error. 2 Saund. 393; 2 Gabb. Cr. Law, 563. The moment the criminal record comes to the past tense in the chronicle of the acts going on at the trial, we lose on the record the personal presence of the prisoner, without which, in all stages of a criminal proceeding, it is an absolute nullity.

3. The seventh, eighth, ninth, and tenth assignments show that the record has no sufficient adjudication of guilt for the felony charged.

For all that appears on this record, Plumer may have been adjudged guilty of manslaughter; which sentence would not warrant the penalty of death. See form of entry of verdict on the record, in Archb. Cr. Pl. (1856) 147; also form of judgment, Id. 152.

IV. The criminal record once entered up, and the term of the court at which the record was made up being ended, that record becomes the property of the defendant, and in it he has a vested right; to it he and his posterity have a right to appeal in all coming time as the permanent history of the judicial proceeding; it cannot be altered or amended.

"When once the judgment is solemnly entered on the record, no court can make any alteration in it; but if any material defect appear on the face of it, it can still be reversed by writ of error." Archb. Cr. Pl. (Eng. Ed.) 153; Sayles v. Briggs, 4 Metc. [Mass.] 421.

"When proceedings have been entered upon the record, the common-law power of amendment ceases; for the judges at common law were prohibited from allowing alterations to be made in any record." Britton, Proem. 2, 2; Smith, Lead. Cas. Eq. (5th Ed.) p. 589, note 1; see Bull. N. P. 321; 3 Bl. Comm. 407; 1 Bac. Abr. tit. "Amendment." G. P. 167; 2 Sell. Prac. 458; Short v. Kellogg, 10 Ga. 182; Gibson v. Wilson, 18 Ala. 63; Id. 438; 2 Gude. Prac. 137; 1 Com. Dig. K, "Amendment"; St. 8 Hen. VI. c. 12.

The statutes of jeofails never extended at common law to the king's criminal process.

V. This petition with its assignment is the proper and established mode for reaching these questions in this court, and opens, like the general writ of error, "every substantial defect appearing on the face of the record"; including "irregularity in the verdict or judgment, or any manifest error on the face of the record." Archb. Cr. Pl. 161; 4 Bl. Comm. 391; 1 Chit. Cr. Law, 747; Pickett's Heirs v. Legerwood, 7 Pet. [32 U. S.] 144.

1. It has been already adjudicated, contrary to our hopes and against our confident expectations, that no writ of error lies from the supreme to the circuit court in any criminal case.

2. It must follow then, that this is the highest court of error in a criminal case, and the remedy in error must be open before it. That is to say, it having been held that no writ of error lies from the supreme to the circuit court in such a case as this, it must follow that the circuit court is the supreme court having jurisdiction: for before all supreme legal tribunals, from which there is no appeal, the writ of error coram nobis lies, in the very nature of things.

3. The final remedy in error somewhere, is a fundamental element in every judicial system in both civil and criminal cases. There can, in the very nature of things, be no complete judicial system without this final redress for judicial mistakes. Whether the given case is a proper one for the remedy is one thing, but that there is such remedy is inherent.

4. The locality of the redress must be in the highest court having jurisdiction of the subject-matter. If there is no remedy by error from the supreme to the circuit court in criminal cases, the circuit court is the highest court of criminal jurisdiction in such cases, and the writ of error coram nobis must be maintainable.

5. It is no answer to say that in this case some of the points were made and then waived on motion for new trial, or that all of them were open in arrest. All this is true of most questions raised in error.

6. Nor is it any answer to say that the circuit court, being created by statute, has no common-law jurisdiction or process, as it confessedly has the common-law procedure in pleading, practice, and evidence; and these questions plainly relate to procedure.

To an inquiry upon these several points, and to a more elaborate enforcement of these suggestions, my associates ask attention; and, that their better words may be heard, I give way to them.

Mr. Heard followed upon the same side. Most of his propositions are stated in the preceding case, and he supported them by the authorities there referred to, and many others to the same effect.

Mr. Butler then followed in vindication of the petitioner's right to the writ, and in support of the validity of the various errors assigned. He commenced by announcing what he claimed to be a canon of criticism and judgment upon a record in a case of capital felony in the United States courts, namely, that the record must be a memorial of all the proceedings of the court, and that nothing can be taken by intendment.

The United States were sometimes said to have no common law; but yet he claimed that they did have common law in definition, remedy, and procedure, though not in jurisdiction or power. It was not exactly the common law of England, but it might be well enough defined the common law of England as practised here. On this ground he supported and invoked the English decisions in cases of definition, remedy, and procedure. He then proceeded to discuss the validity of the errors assigned. If his canon was correct, he believed that the court must decide that this record was faulty to such a degree that they must set it aside.

He took up the errors assigned in the same order as that he adopted in arguing in support of the application in the preceding case, and he supported his propositions by the same authorities.

C. L. Woodbury, Dist. Atty., and Milton Andros, Asst. Dist. Atty., for the United States.

1. The process invoked is not included in the grant to this court by the process act. There is no criminal jurisdiction for the United States court in criminal matters.

2. The averments in the indictment regarding the nationality of the vessel are such that the jurisdiction of this court attaches. For the limitations which have been put upon this jurisdiction, see U. S. v. Bowers, 5 Wheat. [18 U. S.] 197. For those refused by the court, see the applications in Furlong's Case, Id. 203, and in U. S. v. Holmes [Case No. 15,382].

The distinction between piracy and murder was elaborately argued by Mr. Marshall, afterwards chief justice, in Nash's Case [U. S. v. Robins, Case No. 16,175], which see.

The act of 1825 [4 Stat. 115] was passed to distinguish piracy from murder. See Act 1790 [1 Stat. 131]; also 5 Wheat. [18 U. S.] 197.

The jurisdiction extends on board any vessel not belonging to a foreign nation, and this is the gist of Nash's Case. No American ship loses her nationality, except by a sale to a foreigner.

Statutes also extend to ships built after the act, or before the act, or ships forfeited for breach of laws and to foreign wrecked vessels.

The averments of residence and character of vessel are sufficient. Jurisdiction is matter en pais. Ship's papers are not decisive. U. S. v. Bowers, 5 Wheat. [18 U. S.] 199–204, 7th point, 206.

And the burden of proof is on the defend-

ant. Lyle v. Rodgers, 5 Wheat. [18 U. S.] 419.

Is the allegation that the owners were citizens of the United States sufficient? U. S. v. Furlong, Id. 203; U. S. v. Imbert [Case No. 15,438]. Jurisdiction is not limited to vessels owned by citizens of United States. Congress has police jurisdiction on the high seas, irrespective of the nationality of the vessel, under its power to regulate commerce. See U. S. v. Coombs, 12 Pet. [37 U. S.] 72–78. Acts 1820–1825 on slave-trade. Act 1807, § 7, vessels hovering on the coast to land slaves. [2 Stat. 428.] Act 1847, § 1, alien vessels depredating on our commerce when there is a treaty with their country. [9 Stat. 175.] Act 1804, § 1, on burning ships. [2 Stat. 290.] Act 1825, § 4, murder or stabbing where the party dies on land. See, also, section 5 [4 Stat. 115, 116]. So also in piracy, see below, and other offences against the law of nations. Prima facie, parol proof of the averment was sufficient. U. S. v. Peterson [Case No. 16,037]; U. S. v. Bowers, 5 Wheat. [18 U. S.] 204, 206. And the burden is afterwards on the defendant. Lyle v. Rodgers, Id. 419.

The regularity of the ship's papers has no relation under these acts (1825 or 1790) to the offence. U. S. v. Peterson [supra]; McClung v. Ross, 5 Wheat. [18 U. S.] 119; U. S. v. Bowers, Id. 204, 206; Lyle v. Rodgers, Id. 418; U. S. v. Holmes [Case No. 15,382].

The authorities cited for the prisoner, which refer to the forfeiture of ships, are not applicable, as the nationality remains unchanged by the forfeiture. Reference is made to the registry act, but it does not limit the scope of the acts of 1790 and 1825. Its objects are purely commercial. U. S. v. Gibert [Case No. 15,204].

Before CLIFFORD, Circuit Justice, and SPRAGUE, District Judge.

CLIFFORD, Circuit Justice. Prior to the filing of the petition in this case, the prisoner had been indicted and convicted, in the circuit court for this district, of the crime of wilful murder upon the high seas, and out of the jurisdiction of any particular state, and having waived and withdrawn the respective motions for new trial and in arrest of judgment, which he filed subsequent to the verdict of the jury, he had been sentenced by the court to suffer the punishment of death, as provided by the act of congress under which the indictment against him was found. 4 Stat. 115. Convicted, by the verdict of the jury, of the crime charged in the indictment, and having received the final sentence of the law, he was remanded to prison, under a warrant issued in due form for that purpose, where he remained awaiting the execution of the sentence, until the 2d of July, 1859, when the petition in this case was filed. Though the prisoner had withdrawn the motions usually employed in criminal cases to correct er-

rors in the rulings and instructions of the court, and for arresting the judgment when the indictment is defective and insufficient, he still insists that there are defects and errors in the process and proceedings, and also in the record and judgment in the case, as set forth in the paper annexed to the petition, and marked "assignment of errors," and prays the court that "the record and judgment may be set aside, reversed, stayed, respited, reprieved, annulled, and held for naught, and that he may be discharged thereof, and be suffered to go without day." Eighteen supposed errors are set forth in the paper annexed to the petition, but they were classified at the argument under twelve heads, and it will be convenient for the court to follow the order adopted at the bar. Before considering the respective errors, however, as set forth in the paper before referred to, it becomes necessary to inquire and determine whether the circuit court possesses the power to re-examine, reverse, set aside, and annul its own judgments in such a case, in this form of proceeding. Nothing is better settled than the rule of decision that the circuit courts have no common-law jurisdiction in criminal cases, and it necessarily results from that proposition that the answer to the inquiry as to the power of the court to grant the prayer of the petition must depend upon the construction of the act of congress organizing the judicial system of the United States, and other kindred acts upon the same subject. U. S. v. Hudson, 7 Cranch [11 U. S.] 32; U. S. v. Coolidge, 1 Wheat. [14 U. S.] 415; U. S. v. Bevans. 3 Wheat. [16 U. S.] 336; Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 563.

Acts not previously defined as an offence against the authority of the United States cannot be punished as such, as the United States have no unwritten criminal code to which resort can be had as a source of jurisdiction in such cases. Conkl. Treat. 168. Courts which originate in the common law possess a jurisdiction which must be regulated by their common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. Ex parte Boleman, 4 Cranch [8 U. S.] 93; U. S. v. Libbey [Case No. 15,597]; U. S. v. Wilson [Id. 16,731].

Circuit courts were created by the judiciary act, and they are courts of limited and special jurisdiction; and being without any common-law authority to try or punish offenders, except for contempt, they cannot exercise any power, in a criminal case, not derived expressly or impliedly from an act of congress. Exclusive cognizance of all crimes and offences cognizable under the authority of the United States was conferred upon the circuit courts by the eleventh section of the judiciary act, except in cases where the same act authorized the district courts to exercise

the same jurisdiction; and the same section provides that the circuit courts shall have concurrent jurisdiction with the district courts of the crimes and offences cognizable in the district courts. 1 Stat. 79. Those exceptions from the exclusive cognizance of the circuit courts over crimes and offences committed against the authority of the United States were comparatively few at that period of our history; but the third section of the act of the 23d of August, 1842, provides that the district courts shall have concurrent jurisdiction with the circuit courts of all crimes and offences against the United States, the punishment of which is not capital. 5 Stat. 517. Indictments for all offences against the United States may be found either in the district or circuit court, and may, on motion of the district attorney, and by the order of the court where pending, to be entered on its minutes, be transmitted from one court to the other for trial; except that indictments for capital offences found in either court are triable only in the circuit court; and, if found in the district court, they must be remitted to the circuit court for that purpose. 9 Stat. 72. Except as to capital offences, the circuit and district courts, in the exercise of jurisdiction in criminal cases, are courts of concurrent and co-ordinate powers, the former bearing no relation whatever to the latter as an appellate tribunal. The authority to re-examine, by writ of error, final judgments in civil actions, rendered in a district court, is conferred upon a circuit court where the matter in dispute, exclusive of costs, exceeds the sum or value of $50; but the acts of congress nowhere authorize the circuit courts to re-examine by writ of error, or in any other manner, the rulings or judgments of the district courts in criminal cases. District courts as well as circuit courts have power to grant new trials in all cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law, meaning the common-law courts of the state; and that power extends to the setting aside of verdicts in criminal cases as well as in civil actions in courts of original jurisdiction. New trials may be granted, in favor of the accused, to correct an erroneous ruling of the court in admitting improper testimony or in rejecting proper and material testimony, for misdirection of the court, or for the misconduct of the jury, or for newly discovered testimony, or because the verdict is against the evidence or the weight of the evidence, as in civil actions at common law. Judge Story held, in U. S. v. Gibert [Case No. 15,204], that a new trial could not be granted in a case where the punishment was death; but it is now everywhere held that a new trial may be granted in such a case, on the application of the accused. U. S. v. Williams [Id. 16,707]; People v. Morrison, 1 Parker, Cr. R. 625; 2 Benn. & H. Lead. Cr. Cas. 464; Reg. v. Scaife, 2 Denison & P. Crown Cas. 281; Campbell v. Reg., 11 Adol.

& El. (N. S.) 814; King v. Reg. 14 Adol. & El. (N. S.) 31.

Effective means are provided and ample facilities afforded to the accused, in a criminal case, for testing the jurisdiction of the court, and the sufficiency of the indictment, as far as such objects can be accomplished in the same court, without any such resort as that which is proposed in the case before the court. Before pleading, the accused may, if he sees fit, move to quash the indictment, setting forth as reasons one or both of those causes, and if that motion is overruled, he may demur to the indictment either generally or specially; and the settled practice of the court is. that if the demurrer is overruled, the judment of the court, if the charge is of the grade of felony, shall be respondeat ouster, as at common law. Both of these remedies are open to the accused before he is required to plead to the merits, and after verdict, if he does not prevail before the jury, he may file a motion in arrest of judgment, alleging the same defects; and the rule is equally well settled that such a motion, like a demurrer, not only calls in question the jurisdiction of the court, and the sufficiency of the indictment, but extends also to any error in law which is apparent in the record.

Since the decision in the preceding case, [Case No. 16,055] it may be assumed without further argument that a writ of error from the supreme court to the circuit court, or from the circuit court to the district court, will not lie in any criminal case, because there is no provision in any act of congress authorizing any such proceeding, whether the charge be felony, or only a misdemeanor; but if it be true that a writ of error may be sued out in this case, to be heard in the circuit court where the trial was had. and where the judgment was rendered, then the same right may be exercised in every criminal case as well in the district court as in the circuit court; and the rule is just as applicable in misdemeanors as in the case before the court, which is expressly declared by the act of congress to be a felony. Either the right exists without any limitation, or it does not exist at all; and if it does exist, it may be exercised in every criminal case, whether the judgment was rendered in the district or circuit court, and whether the charge is a felony, punishable with death, or a mere misdemeanor. Seventy years having elapsed, or nearly so, since our judicial system was organized, the conclusion would seem to be a reasonable one that if there is any foundation for the right claimed to be exercised in this case, some trace of a prior exercise of it, or of a claim to exercise it in a criminal case, would be found in some reported decision of the circuit or district courts; but no such decision is referred to, nor is it even suggested in argument that any such right in a criminal case was ever before claimed in either of those courts. Errors of fact in the process issued in a civil action, or such as happened

through the fault of the clerk in the record of the proceedings prior to the judgment, might be corrected at common law by a writ of error sued out and returnable in the court where the action was commenced and where the judgment was rendered. When granted to re-examine a judgment rendered in the king's bench, the writ was called a writ of error coram nobis, because it was founded upon a record and process described in the writ as remaining "before us," in accordance with the theory that the sovereign of the kingdom presided in the court. 2 Tidd, Prac. (Am. Ed. 1856) 1137; Jaques v. Cesar, 2 Saund. 101, note 1; De Witt v. Post, 11 Johns. 460. Such writs might also be sued out in the common pleas for a like purpose, that is, for the correction of errors of fact in the process of a civil action, or such as happened in the record of the proceedings through the fault of the clerk; but the writ when sued out and returnable in the latter court was denominated a writ of error coram vobis, because the writ was directed to "you and your associates," meaning the chief justice and the other justices of that court. 1 Archb. Cr. Prac. (6th Ed.) 504. Apart from the fact that these formal differences designated the particular court in which the judgment was rendered, and to which the writ was returnable, they were never of any practical importance, as the office of the writ of error was the same in both courts. Where the error is one of fact, and not of law, a writ of error coram nobis in the king's bench, or coram vobis in the common pleas, lies in the same court, as where the defendant, being under age, appeared by attorney, or where the plaintiff or defendant was a married woman at the commencement of the suit, or died before verdict, or before interlocutory judgment. 2 Tidd, Prac. 1137; 1 Arch. Cr. Prac. 504; 2 Sell Prac. 363.

Errors of the description mentioned are usually corrected in the federal courts on motion to amend, supported, if need be, by affidavit; but reported cases may be found in which it was claimed that a writ of error would lie in the same court to reverse the judgment on account of such defects. Instances of the kind are not numerous, but the practice is not entirely unknown, though it has never received the sanction of the supreme court. Picket v. Legerwood, 7 Pet. [32 U. S.] 144. Resort to that remedy has certainly been had in a few instances in the circuit courts in civil cases, but the writ of error is usually denominated a writ of error coram vobis, as it is directed to the justices of the court where the judgment was rendered; and all the authorities agree that if the error be in the judgment itself, and not in the process, a writ of error does not lie in the same court to correct it; and the supreme court has decided that it is not one of those remedies over which the supervising power of that court is given by law. Picket v. Legerwood, Id. 148; Waldron v. Craig, 9 Wheat. [22 U. S.] 576; 2 Sell. Prac. 399. Called by whatever name the writ may be, strong doubts are entertained whether the circuit courts are authorized to re-examine their own judgments even in civil cases in that mode of proceeding, as the judiciary act contains no regulations whatever for the exercise of any such power. Such a writ, that is, the writ of error coram nobis, will undoubtedly lie in the king's bench, as before explained, for the correction of errors of fact in the process, or for such as occurred through the misprision of the clerk; and it is equally clear that the power to revise such errors in that mode, extends in that court to criminal cases as well as to civil cases, and that when exercised in the re-examination of criminal cases, it extends to questions of law as well as questions of fact; but the better opinion is that the jurisdiction in criminal cases, except that it extends to questions of law as well as questions of fact, is no more comprehensive than in civil cases. Reg. v. O'Connell, 7 Ir. Law R. 356, 357; 9 Vin. Abr. 491; 1 Fitzh. Nat. Brev. 2. Proceedings in error under that process do not anywhere extend to the judgment in civil cases, as a writ of error for that purpose must be brought in another and superior tribunal. Picket v. Legerwood, 7 Pet. [32 U. S.] 148; Rolle, Abr. 746; Sell. Prac. 363; 3 Bac. Abr. 366, Error 6, 366; 3 Bl. Comm. 407, note 3; 4 Petersd. Abr. 255, Error a, note 3.

Writs of error in case of treason or felony could never be sued out ex debito justitiæ and it was necessary at common law, even in cases below felony, to obtain the fiat of the attorney-general, before the proper clerk could issue the writ. 1 Chit. Cr. Law, 369; Rex v. Wilkes, 4 Burrows, 2551; Lavett v. People, 7 Cow. 340; Reg. v. Paty, 2 Salk. 503; 2 Gude, Prac. 219.

Applications for a writ of error were never granted at common law without being first subjected to some preliminary examination; and the same remark may be made of the practice in the state courts in all cases where the applicant stands convicted of an offence punishable with death. 1 Archb. Cr. Prac. 717. Direct authority to grant a writ of error in a criminal case is not conferred upon the circuit or district courts, nor is there an act of congress which contains any regulation upon the subject; so that if the right to the writ exists at all, it exists in every case, as a common-law right, whether the applicant was convicted and sentenced in the circuit or district court, and without any necessity that the writ should be previously allowed by the court or by the prosecuting officer. Dugdale's Case, 1 Dears. Crown Cas. 78; 2 Gude, Prac. 219; Reg. v. Paty, 2 Salk. 503; Archb. Pl. & Ev. (15th Ed.) 167. Authority to grant the writ of error in this case, it is contended, may be deduced from the fourteenth section of the judiciary act, which provides, among other things, that the federal courts "shall have power to issue writs of scire facias, habeas corpus, and all other

writs not specially provided for by statute which may be necessary for the exercise of their respective jurisdictions, and agreeably to the principles and usages of law"; but the jurisdiction of the court over the case, as given by the eleventh section of the act, was completed when the petitioner had been indicted, tried, convicted, and sentenced, and remanded to prison, and was there remaining awaiting the execution of the final sentence of the law, and the case had passed from the docket of the court. Other writs besides writs of scire facias and habeas corpus may be issued, it is said, though not specially provided for by statute, if they are necessary for the exercise of the jurisdiction of the court; and it must be conceded that such is the language of that clause of the section, but the very words of the section are, that such other writs may be issued when necessary for the exercise of their jurisdiction. Unless the writ is necessary to the exercise of jurisdiction already vested in the circuit court, the power to issue the writ cannot be deduced from that clause; but the uniform construction given to the provision is that congress only intended to vest the power to issue such "other writs" in cases where the jurisdiction already existed, and not where the jurisdiction was to be acquired by means of the writ to be issued. M'Clung v. Silliman, 6 Wheat. [19 U. S.] 601; McIntire v. Wood, 7 Cranch [11 U. S.] 506; Kendall v. U. S., 12 Pet. [37 U. S.] 624.

Completed as the proceedings in the case were, the circuit court, at the date of this application, had no more power over it than if the indictment had never been found. Examined closely, it is quite clear that the theory of the petitioner does not assume that the writ is necessary to the exercise of any jurisdiction conferred by any other provision in any act of congress; but the argument is, that the clause in question confers the right to issue that writ, and that the power to grant the writ carries with it the power to exercise the jurisdiction under it as known and understood at common law. Grant that theory, and the consequence would be that the circuit courts would at once become courts of general jurisdiction, as the exceptions in the act of congress may be supplied by the act of the court in issuing the appropriate writ under that clause of the fourteenth section of the judiciary act. Apart from the power to issue "such other" writs in aid of jurisdiction already existing, there is no provision contained in the judiciary act which affords any support to the theory of the petitioner, nor does the act contain any regulations upon the subject; and the court is of the opinion that the construction attempted to be given to the clause referred to, is as unwarranted by its language as it is unsupported by the usages and practice of the circuit courts. Motions for new trial and in arrest of judgment are common in the circuit courts; but the settled practice is, that the latter as well as the for-

mer must be made before the sentence is pronounced. Such certainly was also the general rule at common law, but authorities are not wanting which assert the doctrine that the court might under special circumstances alter the sentence, or even arrest the judgment, without any motion being made, at any time during the same term, for good cause shown, or for errors apparent in the record. King v. Price, 6 East, 323; King v. Waddington, 1 East, 146; 1 Archb. Cr. Prac. & Pl. 186; State v. Harrison, 10 Yerg. 542; Rex v. Lookup, 3 Burrows, 1901; Miller v. Finkle, 1 Park. Cr. R. 374; Com. Dig. "Indictment," note; 1 Chit. Cr. Law, 663; Com. v. Hearsey, 1 Mass. 139; Rex v. Justices of Leicestershire, 1 Maule & S. 442; Holden's Case, 2 Leach, 1026. Extreme cases may be imagined where the court would be justified in exercising that extraordinary power, as if it appeared that the act of congress under which the indictment was drawn had been repealed, or if it appeared in a case like the present that the person alleged to have been killed was in full life. Influenced by that consideration, and in view of the fact that a motion in arrest of judgment as well as a motion for new trial was seasonably made in the case, and withdrawn and waived, the court will examine the several causes of error set forth in the assignment annexed to the petition. Causes one and two may be considered together, as they have respect to the jurisdiction of the court. They are as follows:—

1. That there is no sufficient averment in the indictment that the circuit court had jurisdiction of the offence alleged to have been committed by the prisoner. 2. That there is no sufficient averment therein that the supposed injured party was alleged to have been at the time within or under the protection of the United States, or in the peace thereof. Wilful murder, it is suggested, although committed upon the high seas, may not be cognizable in any circuit court of the United States, and the suggestion is doubtless correct; but the indictment in this case alleges in addition to those words, which are of essential importance, that the crime was committed "in and on board of" a certain ship called the "Junior, then and there owned by and belonging to" the four persons therein named, all of whom are alleged to be "citizens of the United States"; and the further allegation is, that all the criminal acts of the prisoner, including both the felonious assault, with malice aforethought, and the mortal wound which terminated the life of the deceased, were committed within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of this court, and out of the jurisdiction of any particular state of the said United States. Exception in point of fact is not taken to any of these general averments, but the real objection of the prisoner is, that the allegation that the ship is owned by and belongs to certain citizens

of the United States is not sufficient to show that the Junior was a ship of the United States within the meaning of the acts of congress giving jurisdiction to the circuit courts in criminal cases. He refers to the first section of the act requiring ships and vessels to be registered, and insists that the first four counts of the indictment are bad because they do not contain the allegation that the Junior was a ship of the United States, but those counts and each of them do contain the allegation that the ship was "owned by and belonging to" certain persons therein duly described by their appropriate names, and it cannot be doubted that those words constitute a sufficient averment as to the ownership of the vessel, and inasmuch as the persons named as such owners are alleged to be citizens of the United States, the argument that the national character of the ship is uncertain on the face of the indictment, is entirely unsupported, and without any foundation. 1 Stat. 287. Ships and vessels are required to be registered or enrolled, it is conceded, in order to be entitled to the benefits and privileges which the register and enrolment confer, but those documents are not indispensable in a prosecution for piracy or murder on the high seas, as the register or enrolment of the vessel may be in the name of one person while the property of the vessel is in another; and the rule is well settled that the property or national character of a vessel is matter in pais, and that it may be proved by parol testimony. U. S. v. Griffin, 5 Wheat. [18 U. S.] 205; U. S. v. Pirates, Id. 199. Indictments founded on the section under consideration must allege that the offence was committed out of the jurisdiction of any particular state as well as that it was committed upon the high seas, because those words are contained in the section defining the offence, and because the circuit courts have no jurisdiction of the crime of murder, even though the crime was committed on board a ship of the United States, as defined in the registry act, if the ship at the time was within the fauces terræ, as the enclosed or landlocked waters of a bay, creek, haven, or basin are not recognized, in criminal cases like the present, as forming a part of the high seas. U. S. v. Bevans, 3 Wheat. [16 U. S.] 386; U. S. v. Ross [Case No. 16,196]; U. S. v. Smith [Id. 16,337]; U. S. v. Robinson [Id. 16,176]; U. S. v. Grush [Id. 15,268]; U. S. v. Griffin, 5 Wheat. [18 U. S.] 205. Circuit courts, it must be conceded, do not possess jurisdiction of the crime of murder when committed on board a foreign vessel, except to a very limited extent, and never where the perpetrator of the crime, and the deceased, were both foreigners. On the contrary, the general rule is that such courts have no jurisdiction of the offence even when committed upon the high seas, except when committed on board a ship or vessel of the United States, unless it appears that the vessel was sailing under no national flag. But persons indicted under that section cannot be shielded from the punishment annexed to the offence, because the master of the vessel did not have on board the register or the enrolment of the vessel, nor can they be so shielded even if it appear that the vessel was never legally registered or enrolled, if she was owned by and belonged to citizens of the United States, and that the deceased as well as the prisoner was in and on board the vessel at the time the felonious homicide was committed. Proof of the most satisfactory character was exhibited to the jury that the deceased was a citizen of the United States, and that he was the master of the ship, duly appointed according to law; that the prisoner was in and on board the ship when he committed the felonious assault, and inflicted the mortal wound; that the ship was owned by and belonged to citizens of the United States residing at New Bedford, in this district; that she was duly registered at the custom-house in that collection district; that she sailed from that port on a whaling voyage; that the alleged offence was committed by the petitioner while the vessel was cruising for whales, in the Indian Ocean, under the protection of the flag of the United States; and the court is of the opinion that the allegations of the indictment are sufficient to warrant the introduction of those proofs, and consequently that there is no error in that part of the record. U. S. v. Pirates, 5 Wheat. [18 U. S.] 199. Suppose it was otherwise, still the judgment ought not to be arrested for that cause, as the fifth count of the indictment contains the allegation that the Junior was an "American vessel then and there belonging to a citizen or citizens of the United States." Two objections, however, are taken to that count, which will be briefly considered. 1. That the averment that the ship was an American vessel is not sufficient, as the words of the registry act before mentioned are "ships and vessels of the United States"; but there is no merit in the objection, as the two phrases are used indiscriminately in the acts of congress defining offences, and may well be regarded as synonymous in criminal pleading in the federal courts, as applied to ships and vessels belonging to private owners. 2. That the count is also bad because it alleges that the names of the owners of the ship are unknown, whereas their names are set forth in the four counts preceding; but the objection must be overruled, as the prosecutor is always allowed that privilege where the evidence is conflicting, or the real ownership is in any doubt. The next objection is founded on the third cause set forth in the assignment of errors, which is to the effect that the prisoner was not permitted to exercise his constitutional right of challenge to the jurors impanelled for his trial. Chal-

lenge for cause is doubtless a constitutional right, as without its exercise the prisoner might be deprived of an impartial jury, but the peremptory challenge is a privilege conferred by law, which may be enlarged, abridged, or annulled by the legislative authority. Twenty peremptory challenges, however, are allowed by law in the federal courts, to a prisoner charged with the crime of murder. and no trial in such a case would be a legal one if that privilege was not fully accorded to the prisoner. Four persons were joined in the same indictment in this case, and two counsel were assigned to each by the court, at their request, before they were required to plead to the merits, and they exercised the right of challenge to the full extent allowed by law, as was admitted by the counsel of the prisoner at the argument. They could not deny that fact; but the precise objection is that no such statement is set forth in the record of the case. Such facts are not usually set forth in the record, nor is it necessary that they should be where the right is fully enjoyed by the prisoner to his entire satisfaction and that of his counsel. Where objections are made, they should be entered in the minutes of the court, and if overruled, the court will save the question whenever thereto requested by the prisoner or his counsel. Causes four and sixteen will be considered together. They are as follows:—

1. That it does not appear by the record that the prisoner was present at the impanelling of the jury or at the trial; or, 2d, when the verdict was rendered by the jury. But it is not possible to sustain any one of those objections, as they are not correct in point of fact. By the record it appears that the prisoners were severally set at the bar, and had the indictment read to them, and that they severally pleaded that they were not guilty; that counsel were assigned to each as before explained; that they acknowledged that they had severally received a copy of the indictment and a list of the jurors, agreeably to law, and more than two days before the day of their trial; that a jury was thereupon impanelled and sworn to try the issue, and that the jury afterwards returned their verdict as set forth in the record. Tested by the record it appears that the whole proceedings took place on the same day. but the docket entries show the exact dates of the several steps in the trial, from the finding of the indictment to the verdict and sentence. Properly construed, the record does show that the prisoner was present at every stage of the trial referred to in those causes of error. The complaint is made, in the next place, that the prisoner was not permitted to address the jury in his own proper person; but the decisive answer to the complaint is that he never made any such request, nor did his counsel in any way signify to the court that he desired any such privilege. He was duly

indicted by a grand jury; was informed of the nature and cause of the accusation; was furnished with compulsory process for obtaining witnesses in his favor; was confronted with the witnesses against him; was allowed to have the assistance of counsel, and was "permitted to make his full defence by counsel learned in the law." Two counsel were assigned to him of his own selection, and both were permitted to argue to the jury in the close.

Attention will next be called to the sixth cause of error presented by the prisoner, which is that the verdict was rendered upon all the counts of the indictment, and that one or more of the same were defective, and insufficient in law to support the sentence. Evidently the proposition concedes that some of the counts are good, and it may be added that the argument fails to convince the court that any one of them is bad. Grant, however, that one or more of the counts are bad, still as it is conceded that some are good, the court is of the opinion that the objection must be overruled. Undeniably the rule at common law was, that a valid judgment could not be given in a civil case on an uncertain verdict, and that a verdict must be regarded as uncertain if any part of the damages are referable to a bad count; but the rule as universally acknowledged in criminal cases was, "that if there is one good count to support the verdict, it shall stand good, notwithstanding all the rest are bad"; and that is the settled rule in the federal courts, and in all except one of the state courts. Peake v. Oldham, Cowp. 275; Rex v. Benfield, 2 Burrows, 980; Reg. v. Rhodes, 2 Ld. Raym. 886; Rex v. Hill, Russ. & R. 190; Reg. v. Ingram, 1 Salk. 384; Grant v. Astle, 2 Doug. 730; Young v. King, 3 Term R. 98; Rex v. Powell, 2 Barn. & Adol. 75; Rex v. Fuller, 1 Bos. & P. 180; Rex v. Mason, 2 Term R. 581. Where there are several counts, some bad and some good, it is competent for the court, though the verdict is general, to render judgment on the good counts only, but it is not indispensable that any such discrimination should be made, as the presumption of law is, that the sentence was awarded on the good counts. U. S. v. Furlong, 5 Wheat. [18 U. S.] 201; Josslyn v. Com., 6 Metc. [Mass.] 236; Jennings v. Com., 17 Pick. 80; U. S. v. Burroughs [Case No. 14,695]; Parker v. Com., 8 B. Mon. 30; 2 Whart. Cr. Law, § 3047. Special attention is called to the case of O'Connell v. Reg., 11 Clark & F. 155; but it is impossible to adopt that rule, as a different doctrine prevailed in the courts of that country, prior to that decision, for nearly two centuries; and when our ancestors immigrated here, they brought that rule with them as part of the common law, which cannot now be changed by the federal courts. Irvine v. Kirkpatrick, 3 Eng. Law & Eq. 17. Sufficient to say that the matter of complaint set forth in the seventh cause of error is contradicted by the record and the docket en-

tries. The allegation is that the acts of the court are stated in the past tense, but the theory of fact is not sustained in respect to any matter material to the validity of the judgment. Subsequent to the verdict the statement is, that the prisoner moves the court here that the verdict may be set aside, and a new trial granted for the causes therein set forth, numbered from one to ten inclusive, and that the prisoner after verdict and before judgment moves the court here that the judgment be arrested, etc., for the causes set forth in the motion filed at the same time, numbered from one to four inclusive, as appears by the respective motions on file. Time was allowed by the court for preparation, but the motions were set down for hearing at a given day. On the appointed day the counsel of the prisoner moved the court for leave to withdraw the motions, but the court refused to grant such leave until the prisoner was brought into court, and being inquired of personally, the record states that he "asks that such leave may be granted." etc., whereupon the court doth grant him leave to withdraw the said motions, and the same are accordingly waived and withdrawn. Continuing, the record also states, said Plumer is then asked if he has anything to say why judgment of death should not now be pronounced against him, and having replied fully, and no good cause appearing, and all matters having been heard and understood by the court, then follows the sentence of the court, which is in the usual form, and is expressed in the present tense. The eighth cause assigned is, that it does not appear that issue was joined between the prisoner and the United States; but it does appear that he was set at the bar for his arraignment; that the indictment was read to him, and that he said that thereof he was not guilty, and that for trial he put himself upon God and the country, which is all that is required in such cases. Prisoners indicted for the crime of murder are certainly entitled to a list of the jury summoned in the case, two entire days, at least, before the trial. The ninth error assigned is, that it does not appear by the record that such list was furnished as required; but the docket entries show that the list was furnished, and the record shows that the prisoner acknowledged in open court before the jury were impanelled, that he did receive it two entire days prior to that time. Following the order adopted at the argument, the tenth, eleventh, twelfth, and thirteenth causes of error will be considered together, as they in fact involve but a single proposition. Taken together they allege that the record does not show of what felony the prisoner was convicted, nor for what felony he was sentenced. The offence is fully set forth in each of the five counts of the indictment, and the record shows that the jury found him guilty upon all of the counts, which is a complete answer to the first branch of the proposition.

Sentences of the kind when pronounced by the court, are addressed to the prisoner, and of course are spoken in the second person, but the practice is to record the same in the third person, as in this case. Omitting redundant words, the sentence as recorded is to the following effect: it is considered by the court that the said Cyrus W. Plumer be deemed guilty of felony, and that he be taken back to the place from whence he came, and there remain in close confinement until Friday, the 24th of June next, and on that day, between the hours of eleven o'clock in the forenoon and one o'clock in the afternoon, he be taken thence to the place of execution, and that he be there hanged by the neck until he be dead. Apart from the first clause no objection is taken to the sentence, and none can be, as it follows in every particular the form used in every capital case in this circuit since our judicial system was organized. Uncertainty is the foundation of the objection, but two answers may be made to it, either of which is conclusive: 1. That the clause of the sentence, that the prisoner be deemed guilty of felony, is surplusage, and forms no part of the sentence required by law. 2. That the language employed must be construed as applied to the indictment and verdict of the jury, which are set forth in the record, and that the language, when so construed, is certain and free from any ambiguity. Founded as the indictment is upon the fourth section of the act of the 3d of March, 1825, it is clear that the statement that the prisoner be deemed guilty of felony was wholly unnecessary, as it is but the repetition of the legislative enactment, and that it is no part of the judgment of the court.

The repugnancy of the verdict to the clause giving jurisdiction to the court, is the matter included in the fourteenth cause. Five counts are contained in the indictment, and the verdict is that the prisoner is guilty. Sentence was passed upon all the counts; and the argument is, that in comparing the verdict with the jurisdictional clause of the indictment, the legal conclusion is that the prisoner stands convicted of more than one offence, and consequently that the verdict is repugnant to that clause which alleges that the prisoner was "first brought into the district of Massachusetts after committing the aforesaid offence," not offences, as it should have been in order to correspond with the verdict of the jury. But such criticism is too technical to prevail even in criminal pleading, as the several counts are obviously founded on the same homicide. They set forth the killing of the same person, on board the same ship, on the same day, and by substantially the same means; and, if it were otherwise, the proper conclusion would be, that the word "offence" in the jurisdictional clause applied severally to the respective counts, and not collectively, as contended by the counsel of the prisoner. Indictments

must be signed by the foreman of the grand jury, but when the word "foreman" is appended to the name of the person signing the same as such, the signature is sufficient, as the designation "foreman" refers to the introductory clause of the indictment, and to the record, as verifying the legal inference that "foreman" means foreman of the grand jury. Remarks upon the last cause assigned, to wit, the eighteenth, are unnecessary, as it was conceded at the argument that it did not have respect to any defects, except such as are included in the special assignments to which reference has been made.